Victor Cooper v. Commissioner. Chester Distributing Co., Inc. v. Commissioner.
Cooper v. Commissioner
Docket Nos. 18083, 18084.
United States Tax Court
1949 Tax Ct. Memo LEXIS 118; 8 T.C.M. (CCH) 689; T.C.M. (RIA) 49187; August 8, 1949
John C. Ristine, Esq., for the petitioners. Maurice S. Bush, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: In the case of Victor Cooper, Docket No. 18083, the respondent determined a deficiency in income and victory tax in the amount of $10,984.16 for the calendar year 1943. Because of the forgiveness feature of the Current Tax Payment Act of 1943, the year 1942 is also involved. In the case of the Chester Distributing Co., Inc., Docket No. 18084, the respondent determined the following deficiencies: 1941
1942
1943
Income Tax
$1,953.01
Declared Value Excess-Profits Tax
492.21
$ 2,667.27
$ 3,255.08
Excess Profits Tax
560.51
16,404.57
19,444.51 Respondent *119 also asserted a penalty in the amount of $140.13 for the calendar year 1941 for failure of the corporation to file a timely excess profits tax return for that year. The questions presented are - (1) Did the petitioner Chester Distributing Co., Inc., expend in the taxable year the sum of $4,435.20 for ordinary and necessary selling and collection expenses through its president, Victor Cooper, by virtue of which alleged expenditures in the taxable year 1940 it is entitled to a net loss carry-over in the same amount as a deduction for the taxable year 1941? (2) Is the petitioner Chester Distributing Co., Inc., entitled to deductions in the amounts of $8,453.90, $13,773.17 and $21,147.35 for ordinary and necessary expenses alleged to have been expended in its behalf by its president, Victor Cooper, in the respective taxable years, 1941, 1942 and 1943? (3) Is the petitioner Chester Distributing Co., Inc., liable for a penalty in the amount of $140.13 for failure to file a timely excess profits tax return for the year 1941? (4) Do the amounts of $8,359.91 and $17,484.75 received by petitioner Victor Cooper from Chester Distributing Co., Inc., in the respective taxable years 1942 *120 and 1943, purportedly as reimbursement for alleged selling and collection expenses made in behalf of the Chester Distributing Co., Inc., constitute taxable income to petitioner Victor Cooper in the respective taxable years? Findings of Fact The Chester Distributing Co., Inc., (hereinafter referred to as the Distributing Company) is a corporation organized in 1933 under the laws of the State of New Jersey with its principal office and place of business at 18 Mellon Street, Trenton, New Jersey. Its Federal income, excess profits and declared value excess profits tax returns for each of the calendar years 1940, 1941, 1942 and 1943 were filed with the collector of internal revenue at Camden, New Jersey. Its excess profits tax return for the year 1941 was filed on March 7, 1945, and therein it reported that no excess profits tax was due. Victor Cooper is an individual residing at 717 Greenwood Avenue, Trenton, New Jersey. His Federal income tax returns for the years 1942 and 1943 were filed with the collector of internal revenue at Camden, New Jersey. He is 55 years of age and is married to Dora Cooper who is about 50 years of age. During the taxable years 1940 through 1943, he was *121 the president and owned practically all of the capital stock of the Distributing Co. He also owned another corporation known as the Vee Cee Gas & Oil Co., and had extensive real estate holdings and interests in other business enterprises, some of which he owned jointly with his wife. Some of the business interests which Dora Cooper owned in her own name or jointly with her husband were purchased with money furnished by her husband. Victor Cooper devoted most of his time during the years 1940 to 1943 to the business of the Distributing Co. His bookkeeper took care of the office details. The Distributing Company was engaged in the business of the distribution of beers, serving the territory including the City of Trenton and the Counties of Mercer, Burlington, Warren and Middlesex, New Jersey. During the years 1940 and 1943, inclusive, petitioner distributed two brands of beer, one known as Pabst Blue Ribbon, a nationally advertised beer, and another brand known as Chester Beer, a local beer which received very little advertising. The Distributing Company distributed Pabst Blue Ribbon Beer under a contract with the Pabst Sales Company, covering the territory including Mercer, Burlington, *122 Warren and Middlesex Counties, New Jersey. The contract provided, among other things, that "The distributor agrees to work and develop to the satisfaction of the seller the aforementioned territory * * *." During the periods herein involved, the Distributing Company also distributed Chester Beer, which was manufactured by the Chester Brewing Co., Inc., of Chester, Pennsylvania. Victor Cooper had no stock interest in this brewing company, but approximately 40 per cent of its stock was owned by his wife. The Distributing Company introduced Chester Beer into the territory which it served in 1934, and during the taxable years it was sold at $16 or $17 a barrel, which was lower than other distributors in the same territory were charging for comparable beers. During the same period Pabst Blue Ribbon beer was selling at $20 or $21 a barrel. Victor Cooper, during the taxable years, was active in the management of the Distributing Company. In the mornings he supervised and helped the drivers to load the trucks, and in the afternoons and evenings his activities consisted of visiting the places of business of civilian and military customers, and entertaining these customers, officers, enlisted *123 men and civilian personnel of army cams, and others. As manager of the Distributing Company Victor Cooper employed salesmen, collectors and drivers, and did some selling. The salesmen obtained the orders, assisted in the delivery of the beer, collected from the customers for the beer when delivered, and acted as minor salesmen and collectors. During the years 1940, 1941 and until September of 1942 the Distributing Company had two men, Goldberg and Snyder, whose activities were confined to selling. Snyder left the employ of the company at the end of August 1942. The employed salesmen of the Distributing Company were authorized by Victor Cooper to make certain expenditures at the bars of its civilian customers in connection with the sale and/or collection of charges for beer sold to bars. These expenditures were for the setting up of drinks of beer, within the limits hereinafter noted, for tavern patrons on the premises at the time of the sale and/or collection. The amount of money the employed salesmen were authorized to spend in setting up of drinks for bar patrons of its civilian customers was definitely tied to the amount of beer sold to such customers. For this purpose, they *124 were authorized to spend up to and no more than 50 cents for each half-barrel of Chester beer sold; 25 cents for each half-barrel of Pabst beer sold; up to 5 cents for each case of Chester bottled beer sold; and up to 5 cents for each case of Pabst bottled beer sold. This authority extended only to sales made to privately licensed saloons, and did not extend to sales made to bars operated by post exchanges in United States Army Camps. The employed salesmen were reimbursed for moneys expended in setting up drinks out of the company's petty cash on the same day the expenditures were made or on the day following. In order to secure reimbursement they presented detailed vouchers which in most instances showed the date of the expenditure, the name of the tavern where the money was expended, and the amount of beer for which sale and/or collection was made. Each voucher was signed or initialed by the salesman who presented it for reimbursement. During the years 1940, 1941, 1942 and 1943, the Distributing Company made the following reimbursements to its salesmen and collectors, other than Victor Cooper, for monies expended in its behalf for sales and/or collections: 1940
$12,918.52
1941
13,993.09
1942
16,322.53
1943
6,019.53
*125 The Distributing Company also deducted the following amounts in each of the taxable years as "sales and collection" expenditures made by Victor Cooper: 1940
$ 4,435.20
1941
8,453.90
1942
13,773.17
1943
21,147.35 In most instances the amounts shown above were not evidenced by detailed vouchers. Cooper left the Distributing Company's office each morning with a substantial amount of cash in his pocket. The next morning he would report to the company's bookkeeper that he had expended a certain amount the preceding day and would receive reimbursement for this amount from the petty cash account. Vouchers covering the amount reimbursed were generally made out by the bookkeeper for Cooper at his direction and stated only the date, the words "collection expense", "solicitation" or "entertainment" and a single figure indicating the amount of his withdrawal. Cooper seldom initialed or signed these vouchers personally, and they contained no information as to the place or places where the money was expended or the amounts expended at different places. Many of the vouchers contained only a notation of the amount reimbursed, the initials "V.C." and the date. In years prior *126 to 1938 Victor Cooper was very active in visiting taverns and saloons, but in 1938 he was compelled to slow down because of diabetes. In subsequent years he visited civilian customers of the Distributing Company occasionally when he had a customer who was giving the company all or a good share of his business. It was customary for beer distributors to treat customers present in these taverns and saloons to drinks whenever they visited them, and Cooper always followed this practice. Beginning in 1941 and during the years 1942 and 1943 he directed his activities primarily to securing the business from the Post Exchanges of the army camps at Fort Dix and Camp Kilmer. Those camps were located in the territory served by salesman Snyder. Cooper assisted Snyder prior to the time the latter left the employ of the company in September 1942, and thereafter Cooper handled this territory himself. The organization of a Post Exchange in an army camp consists of an Exchange Officer who is in charge, a General Manager, and in addition each unit of the Post Exchange has a manager, and if the volume of business done is large, an assistant manager. The unit managers report to the General Manager. The *127 Exchange Officer in charge arranged for the original contracts for beer and decided what brands would be sold in each PX unit. During the years 1941, 1942 and 1943 Cooper visited the PX units at Fort Dix and Camp Kilmer frequently, and during 1942 and 1943 he was at Fort Dix as many as five or six times a week, visiting three or four PX units each day on the average. Because of inability to get truck drivers he would often act as truck driver and deliver beer to the camps. On some days he would stop in six or eight PX units. Whenever Cooper visited a PX unit he treated all of the soldiers present to drinks of beer, pretzels, potato chips, cigarettes, etc. At each unit he would spend from two to five dollars, and sometimes ten or twenty when the place visited was crowded. This practice was not indulged in by other beer distributors and did not result in any substantial benefit to the Distributing Company. When Cooper first contacted the officer in charge of the Post Exchange at Fort Dix with respect to the sale of its products at PX units, he was informed by the officer that the Post Exchange was interested in purchasing Pabst draft beer but had no facilities for handling it. *128 Cooper offered to supply and install the necessary equipment and asked for and received assurance that if he did so the company would receive a fair share of the PX business. The first installation proved so satisfactory that similar installations were made in other PX units at Fort Dix and at Camp Kilmer. Approximately 35 units were installed consisting of direct draw boxes, including motors and pumps, and storage boxes. This and some other bar equipment such as linoleum for tops of bars were paid for by Cooper in cash. He was reimbursed for these expenditures out of petty cash and the cost was charged to selling and collection expense. Cooper received no receipts for some of these expenditures. The cooling and other bar equipment furnished by the company was contributed without any understanding that it would ever be returned and it was not returned when its use by the PX units was terminated. The company allowed the PXs 25 cents a half-barrel below the prices in town on Pabst beer, and 50 cents a half-barrel on Chester beer, and gave them excellent service, delivering beer on Sundays and whenever it was needed. Because of the large and quick consumptions of beer at these PXs the *129 company was able to fill and refill its beer kegs, of which there was a shortage during the war years, more frequently than would have been possible if this beer had been sold to private customers. Fort Dix and Camp Kilmer, both of which were in the State of New Jersey, were embarkation centers of the United States Army. Enlisted men passing through these embarkation centers were not as a general rule permitted to leave them, and as a result the PX units were well patronized and tremendous quantities of beer were purchased and consumed during the hours they were permitted to stay open. Some of these units sold as many as forty half kegs of beer each day. The privilege of selling beer at these camps was sought by various beer distributors, and once obtained every effort was made to continue this privilege. The Post Exchange authorities and the managers of the Post Exchange bars were at all times well satisfied with the service rendered by the Distributing Company. The company delivered beer promptly as ordered and more promptly than its competitors. Likewise, during the years 1940 through 1943 the officers in charge of the Post Exchanges at Fort Dix and Camp Kilmer, the bar managers, *130 and the enlisted men who patronized the PX bars were well satisfied with the quality and taste of Chester beer. Beginning in 1942 and continuing through the years 1942 and 1943 Cooper engaged in various forms of elaborate entertainment. At his home he had a recreation room fully equipped for serving drinks and food. Here he held parties for from 40 to 80 people, two, three or four times a month. Sometimes his guests were enlisted men, on other occasions officers and their wives, and on a few occasions civilian owners of taverns or saloons were included. While officers and men connected with the operation of Post Exchanges at Fort Dix and Camp Kilmer were often included among his guests, other officers and individuals who had nothing to do with their operation were also included. In 1942 and 1943 new divisions arrived at these embarkation centers every ten or eleven weeks and Cooper would invite the officers of these units to his house and entertain them with food and drinks. He also gave farewell parties at his house for officers of divisions when they received their embarkation orders, and "they would go some place and spend some money and have a good time." Guests at Cooper's home *131 were served roast beef, lobster, shrimp, etc., and any kind of alcoholic beverage they desired. Cooper paid for the cost of these parties cash sums of from $200 to $500 and was reimbursed from petty cash the following day by the bookkeeper of the Distributing Company. He discontinued these parties in 1945, because he felt he could not afford them after a revenue agent advised him the cost thereof was not going to be allowed as deductions in computing the income tax of the Distributing Company. Another form of lavish entertainment indulged in by Cooper was inviting 12 to 15 guests to luncheons of the Circus Saints and Sinners Club in New York City. On these occasions Cooper purchased tickets, drinks before, during and after the luncheons, and in addition paid the cost of entertainment at a night club after the luncheons. He also paid round-trip transportation for his guests. Amounts expended by Cooper on this type of entertainment ranged from $200 to $480, and he was reimbursed from the company's petty cash. He attended these luncheons with guests eight or ten times a year. His guests were either officers, or privates and non-commissioned officers, and some were connected with the *132 operation of the Post Exchanges and some were not. If officers at Fort Dix or Camp Kilmer wanted a case or two of whiskey Cooper got it for them and paid for it. He also made gifts of poultry, and donated liquor and beer for Christmas parties at the Post Exchange. On several occasions Cooper purchased tickets for officers to athletic contests such as baseball and football games. He was reimbursed for these expenditures out of petty cash. All of the aforementioned expenditures by Victor Cooper were charged to "selling and collection" expense on the books of the Distributing Company. Of the amounts claimed to have been personally expended in each of the years 1940, 1941, 1942, and 1943, only the following amounts are supported by documentary evidence such as receipts, statements, etc.: Paid
during 1941 to
1943, incl. (year
1940
1941
1942
1943
not shown)
Bar equipment, supplies, and repairs
none
$1,659.89
$5,048.33
$ 736.25
Entertainment
none
287.70
364.93
1,162.73
$1,679.45 Items classified as "Entertainment" in above table include expenditures for liquor, poultry, meats, cigars, and notions dispensed at *133 parties given at the home of Victor Cooper for officers, enlisted men, and others. They also include the cost of presents of liquor, poultry, cigars, and a $25 wedding present. In the taxable years 1940 to 1943, inclusive, the Distributing Company purchased the following quantities of beer from Chester Brewery, Inc., and the Pabst Sales Company: Year
Chester
Pabst Blue Ribbon
1940
328,464.67 gallons
338,599.00 gallons
1941
327,460.87 gallons
454,217.82 gallons
1942
565,388.25 gallons
547,326.80 gallons
1943
670,562.38 gallons
441,603.75 gallons A portion of the beer purchased was sold at cost to other distributors who were short of beer. Draft beer is sold in half-barrels containing approximately 16 gallons. The amount of beer sold by the Distributing Company during the years 1940 to 1943 to Post Exchanges at Fort Dix and Camp Kilmer, and the amount sold to civilian customers at privately owned saloons or taverns, was as follows: Year
Post Exchanges
Civilian Customers
1940
3,725 gallons
597,235.735 gallons
1941
125,093.23 gallons
620,749.965 gallons
1942
548,305.675 gallons
557,160.005 gallons
1943
611,164.75 gallons
506,092.335 gallons
*134 The profit and loss statements of the Distributing Company show a net operating loss of $4,736.06 for 1940, and a net operating profits of $735.77 for 1941, $10,593.36 for 1942, and $9,708.99 for 1943. Of the amounts expended by Victor Cooper during the years 1940, 1941, 1942 and 1943 and charged to "selling and collection" expense on the books of the Distributing Company the following amounts are deductible by it as ordinary and necessary business expenses: 1940
$2,000
1941
3,500
1942
7,000
1943
6,000
Opinion The first question to be decided in this proceeding is the amount, if any, which the Distributing Company is entitled to take as a deduction in each of the years 1940, 1941, 1942, and 1943, because of moneys which it contends Victor Cooper expended to maintain and advance the sales of the company. The Distributing Company claimed as deductions $4,431.75 in 1940, $7,149.23 in 1941; $12,483.33 in 1942; and $21,073.12 in 1943, and these deductions were disallowed by the respondent. For present purposes the expenditures made by Cooper may be divided into expenditures made in purchasing drinks for patrons of taverns and taprooms; in treating military *135 personnel who happened to be present at these PX units during Cooper's visits to drinks of beer and other articles sold by these units; in making gifts of whiskey to officers; in holding parties at his home; in entertaining at luncheons of the Circus Saints and Sinners Club in New York City and at night clubs following these luncheons; in purchasing tickets for baseball and football games, fights, etc.; and in purchasing beer cooling and other equipment for Post Exchange units at Fort Dix and Camp Kilmer. From the evidence it appears that it was a customary business practice for beer distributors whenever they visited taverns or taprooms operated by civilians to treat the customers present at the time of their visits to drinks, and that Victor Cooper followed this practice. Cooper's visits to civilian customers were more frequent in 1940 and 1941 when his activity with respect to the military end of the company's business was confined to assisting salesman Snyder who served the territory including Fort Dix. After Snyder's departure in September 1942 it appears that Cooper devoted a large part of his time to the military end of the business visiting three or four PX units a day on *136 the average of five or six days of each week. During these visits he indulged in a practice similar to that employed by him in visits to civilian taverns, and on each visit treated the enlisted men present in the PX to beer, candy, cigarettes, etc. Whereas it was customary for a beer distributor to treat patrons of civilian taverns, Cooper was the only beer distributor who indulged in this practice in military PX units. According to the evidence no direct or substantial business benefit accrued to the company from these expenditures and they did not influence the Post Exchanges to use and continue to use the company's products. The men in the PX units, with a few exceptions, were restricted to the camp grounds pending embarkation and during the hours the PX units were open they gathered there to drink beer. In most instances they did not specify any particular beer by name. As one manager of a PX unit testified the boys did not care what kind of beer they got as long as they got beer and it was not necessary for Cooper or anyone else to stimulate the sale of beer. Another manager testified that the practice of Cooper's buying drinks for the soldiers who patronized his PX was "really *137 remarkable and something quite out of line" and another said he never noticed that the boys ever indicated a preference for the company's beer as a result of the expenditures of Cooper. The evidence indicates that the factors which influenced the Post Exchanges to use the company's products were the quality of its beer, its ability to furnish it quickly when needed, and the service it rendered. The expenditures made by Cooper on his visits to PX units were conservative when compared to the large expenditures for entertaining made by Cooper at his home and at luncheons at the Circus Saints and Sinners Club. The nature of this entertainment and the amounts expended thereon are set forth in our findings. At his home and at the Saints and Sinners Club Cooper had quite a variety of guests. Sometimes he entertained civilian owners of taverns and taprooms, and, while the record is not too clear, it indicates that they were not very often included on the guest list. Of the seven tavern keepers who testified for petitioners one stated he was entertained at Cooper's home twice and that most of the guests were tavern keepers, another stated that he was entertained there once on the occasion *138 of Cooper's brother-in-law's wedding, three stated that they had never been entertained by Cooper, and the testimony of the remaining two contained no mention of entertainment. The evidence indicates that the principal recipients of Cooper's hospitality both at his home and at the Saints and Sinners Club were army officers and their wives, enlisted men, and civilians. Some of these men were employed either in the Post Exchange offices at Fort Dix and Camp Kilmer, and some of the civilians were either managers or assistant managers of PX units at these camps. Others had nothing to do with the operation of these post exchanges such as officers of divisions and task force units arriving at the camps, officers of divisions leaving the camps, and a rail transportation and assistant rail transportation officer. In this connection it is interesting to note that out of nine former managers or assistant managers of PX units who testified, all of whom were civilian employees, five testified they had never been entertained by Cooper, two testified they had been entertained at his home once, one that Cooper took him to lunch on one occasion, and one testified he was entertained at Cooper's home *139 on 4 or 5 different occasions when "various fellows would go into the Army." A former officer and general manager of the Post Exchange at Fort Dix testified that at least every three months Cooper would give a party for "key personnel" of the Post Exchange office and that guests would include civilian employees at PX units and officers stationed at Fort Dix. An officer formerly stationed at Camp Kilmer in 1942 and 1943, who was the Commanding Officer of permanent troops at that post and also President of the Post Exchange Council which determined the general policies of operation of the Post Exchange, testified that he and his wife were guests at Cooper's home on four or five occasions and that he was a guest on an equal number of occasions at the Saints and Sinners Club. According to this witness the guests were mixed groups of military and civilian personnel and on two occasions the Commanding Officer of the post was present. Cooper was also quite liberal with gifts. On one occasion he presented a baby carriage to the wife of a supervisor of a Post Exchange. If the officers at Fort Dix or Camp Kilmer wanted a case or two of whiskey he got it for them and paid for it out of cash *140 received from the company, and he also donated liquor and beer for Christmas parties at the Post Exchange and made gifts of poultry. Cooper testified that the reason the Distributing Company made very little profit during the years 1940 to 1943, inclusive, was that he had to be liberal with expenses and had to sell Chester beer cheaper than other brands in order to get his customers to use it. In conflict with this statement is his testimony that it was difficult during the years 1940 to 1943, inclusive, to get enough beer to take care of customers; that during this period the company did not add any new private licensee customers and did not want any; and that in many instances tavern owners asked for beer and he refused to give it to them. Cooper's extravagant expenditures for entertainment undoubtedly represent one good reason for lack of substantial profits, and we are satisfied from the evidence that a substantial portion of them were prompted more by a desire on the part of Cooper to be recognized as a good fellow and the though that the company would benefit by tax deductions than by any business benefit that might accrue to the company. The decision as to the particular brand *141 or brands of beer to be sold at each PX unit was made by the officer in charge of the Post Exchange. It is possible that he might have been influenced in his selection or retention of various brands by recommendations or criticisms received from managers and perhaps other employees of the Post Exchanges. But there is no convincing evidence that he was eveinfluenced in his choice or changed the brand of beer being sold because of any request, recommendation or criticism made by officers and members of military units temporarily stationed at Fort Dix or Camp Kilmer pending embarkation. Neither is there any evidence that any of the latter ever urged the officer in charge of the Post Exchange to install Chester or Pabst beer in any PX unit where another brand or brands were being sold. Not only is there failure to show any immediate business benefit to the company from the entertainment of, or presents given to these transients but any reasonable expectation of future business benefit was practically nil by reason of the fact that most of them were from other sections of the United States and would never again reside in the territory where the company engaged in business. Our conclusion, *142 after carefully considering the evidence, is that expenditures made by Cooper in treating patrons of civilian taverns were ordinary and necessary business expenses; that amounts expended in treating soldiers in PX units were not; that reasonable amounts expended for gifts or entertainment of officers and men employed in or by the Post Exchanges were ordinary and necessary business expenses; and that amounts expended for gifts or entertainment of officers and men only temporarily stationed at Fort Dix or Camp Kilmer awaiting embarkation were not. There remains for consideration the question of whether the Distributing Company may deduct as ordinary and necessary business expenses such amounts as the evidence indicates it expended for beer cooling and other equipment furnished Post Exchange units. The installation of this equipment had its inception in a conversation between the officer in charge of the Post Exchange at Fort Dix and Cooper at the time the first PX unit was opened at that camp. The officer told Cooper he would like to put in Pabst beer but had no cooling equipment. Cooper offered to install the equipment on the condition that the company would be given a fair share *143 of the business, and received assurance from the officer that it would be given a fair share of the business. The first installation met with approval and thereafter the company made similar installations in other PX units. Cooper claims that a total of $8,000 or $9,000 in cash was expended by him at various times for beer cooling equipment and that he received reimbursement from the company. A portion of these expenditures, as shown in our findings, was evidenced by receipts which indicate that the company furnished other items of equipment such as linoleum in addition to the beer cooling equipment and from time to time made repairs at its expense. From the evidence we are satisfied that the company contributed the equipment without any expectation or understanding that it would ever be returned and it was not returned after the close of hostilities. The expenditures were charged to "sales and collection" expense on the company's books. Petitioners contend that these expenditures were properly deducted as ordinary and necessary business expenses in the year made. The respondent contends that these expenditures were neither ordinary nor necessary. He argues that there is no evidence *144 that it was the practice of beer distributors to furnish bar equipment to Post Exchanges at Fort Dix or Camp Kilmer; that the Department of Alcoholic Beverage Control of the State of New Jersey prohibits the furnishing of such equipment to any retail licensee or at any retail licensed premises; that while this prohibition may not technically apply to military camps, it expresses the public policy of the State of New Jersey; and that, in view of the extraordinary demand for beers of any kind at Post Exchanges during the years in question, the outlay of several thousands of dollars for beer equipment installations at army camps appears to be a wholly irresponsible expenditure which cannot qualify as an ordinary and necessary business expense. No evidence is contained in the record which would permit a finding that the furnishing of bar equipment by beer distributors to military camps located in the State of New Jersey was prohibited by its Department of Alcoholic Beverage Control or that the furnishing of such equipment was prohibited by the public policy of the state. The deductions claimed cannot therefore be disallowed on this ground. Neither can they be disallowed on the ground *145 that they were not ordinary expenses, - an argument made by respondent, because the evidence does not show that it was customary for beer distributors to furnish bar equipment, or that any distributor other than the Distributing Company did so. The evidence convinces us that these expenditures were made for the purpose of promoting the sale of the company's products, and that they contributed to the selection of these products in preference to those of other competitors. While the demand for beer at the Post Exchange units was large, the number of brands sold was limited by the officer in charge of each Post Exchange and it was important for beer distributors to get their names on the select list. The nature of expenditures made for sales promotion often vary widely in the same line of business and the fact that one manufacturer adopts a method not utilized by any of his competitors is not as a general rule a sufficient basis for disallowance. Here the expenditures for bar equipment were helpful in the development of the company's business with the army camps and were expenditures that the average business man would be inclined to make when informed that a customer was desirous of *146 purchasing its products in volume but could not do so for lack of certain equipment. Cf. Welch v. Helvering, 290 U.S. 111. We think that the expenditures made for bar equipment and repairs qualify as ordinary and necessary and that the company correctly charged them to current expense. The conclusions we have reached concerning the expenditures made by Cooper which constitute ordinary and necessary business expenses of the Distributing Company do not solve the problem of how much of these expenditures belong in the ordinary and necessary business expense classification and how much do not. Our difficulty in making such a computation arises from the fact that only a small portion of Cooper's expenditures are evidenced by receipts or memoranda showing the purpose of expenditure, its amount, and when and to whom it was paid. The reason expressed by Cooper for confining the record of a substantial portion of his expenditures to slips, listing his name and the amount he withdrew, was that he was not educated and could not write and, inasmuch as he was boss, he did not think it necessary that he make detailed statements of his expenditures to his bookkeeper. Faced with a *147 somewhat similar situation in Cohan v. Commissioner, 39 Fed. (2d) 540, the Circuit Court of Appeals for the Second Circuit said: "* * * Absolute certainty in such matters [determining the amount of ordinary and necessary business expenses where inadequate records are kept] is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent * * *. It is not fatal that the result will inevitably be speculative; many important decisions must be such." After a careful consideration of all the evidence, we have reached the conclusion and have found as a fact that the amounts the Distributing Company is entitled to deduct as ordinary and necessary business expenses resulting from expenditures made by Cooper are $2,200 in 1940, $3,500 in 1941, $7,000 in 1942, and $6,000 in 1943. Our conclusion that the Distributing Company is entitled to a deduction of $3,500 in 1941 reduces its excess profits net income below the amount of $8,017.22 [1] which the respondent *148 determined was the figure it was entitled to deduct from excess profits net income in arriving at adjusted excess profits net income. Inasmuch as the corporation has no adjusted excess profits net income, it is not liable for excess profits tax for 1941 and a penalty for failure to file a timely excess profits return cannot be imposed. The remaining question involves the respondent's determination that the amounts of $8,359.91 and $17,484.75 received by Victor Cooper from the Distributing Company in the respective taxable years 1942 and 1943 [2] constitute taxable income to Victor Cooper in these taxable years. This determination of the respondent is based on the premise that the withdrawals of Victor Cooper in the taxable years 1942 and 1943 from the Distributing Company were not incurred, expended or utilized for the benefit of the company and did not in any event constitute ordinary and necessary expense. *149 While we do not agree with the respondent as to the amounts to be included in the income of Victor Cooper for the years 1942 and 1943, we do agree that $5,483.33 for 1942 ($12,483.33 minus $7,000) and $15,073.12 for 1943 ($21,073.12 minus $6,000) should be included in his income. These are the amounts which in our judgment were withdrawn by Cooper from the Distributing Company and were not expended for its benefit. An individual such as Cooper who is president and practically the sole stockholder of a corporation is in the position to withdraw its funds at will. He can use the funds so withdrawn as he sees fit. If he uses them in a manner which will result in some direct business benefit to the corporation, it is entitled to a deduction. If on the other hand he uses them in some form of entertainment or otherwise from which the corporation does not derive such a benefit, he should not object if they are included in his income as once the corporation is eliminated as the beneficiary of the expenditure he assumes that status. And he should not complain if in treating the above-mentioned amounts as his income we treat lightly his statement that they were not used for his personal benefit. *150 The record shows that he engaged in wholesale and indiscriminate entertainment of military personnel and civilians a large portion of which he knew, or should have known, could not result in any substantial business benefit to his corporation. It built up his reputation as a "good fellow", and the tax he now must pay results from his erroneous impression that the burden of his generosity would be borne by Uncle Sam in the form of deductions allowed to his wholly-owned corporation. Cf. Lucien I. Yeomans, 5 T.C. 870. Petitioners conclude with the alternative contention that if any part of the amounts expended by Cooper are included in his taxable income for the years 1942 and 1943, equal amounts are allowable as deductions to him for the said years under the provisions of section 23 (a) (2) of the Internal Revenue Code as non-trade or non-business expenses paid or incurred during those years for the production or collection of income, or for the management and conservation of property held for the production of income. Petitioners argue that these amounts were all paid out by Victor Cooper either directly for the benefit of the company in its ordinary *151 operations as a beer distributor, or in the alternative, for the benefit of Victor Cooper as the principal stockholder of the company, looking towards the continued collection or production of income from the company. We do not agree with petitioners and do not think it is necessary to elaborate upon what we have heretofore said about the amounts included in the income of Victor Cooper. Suffice to say they were not the type of expenditures that would entitle him to deductions under the provisions of section 23 (a) (2), supra. Decision will be entered under Rule 50. Footnotes
1. Specific exemption of $5,000 plus excess profits credit $1,587.64 plus excess profits credit carry over $1,429.58.↩
2. On Brief respondent states that no deficiencies were determined against Victor Cooper for prior years because such years were not open for the determination of deficiencies. He also explains his failure to include a portion of Victor Cooper's withdrawals in 1942 and 1943 in his income for those years on the ground that the portions not included are represented by receipts, statements, etc., introduced in evidence.↩